JONESBORO, LAKE CITY & EASTERN RAILROAD COMPANY *v.* MINSON.

Opinion delivered February 26, 1912.

MASTER AND SERVANT—NEGLIGENCE—EVIDENCE.—Where the only evidence tending to prove negligence on defendant's part causing the death of plaintiff's intestate was the evidence that the defendant negligently permitted a certain trestle to fall into disrepair, and there was no evidence tending to prove that his death was due to the manner in which the trestle was constructed, evidence tending to prove that the trestle was improperly constructed was misleading and prejudicial.

Appeal from Craighead Circuit Court, Jonesboro District; *Frank Smith*, Judge; reversed.

STATEMENT BY THE COURT.

On the night of the 14th day of September, 1910, Walter Minson, employed by the appellant as a brakeman and acting as hind brakeman on one of its freight trains, was run over by the train, his left leg being crushed and cut off in two places, which resulted in his death a few hours later. Appellee is the widow, and she sues as administratrix of the estate of Walter Minson, alleging that Minson was new and inexperienced in such employment; that he was wholly ignorant of the condition of appellant's roadbed and train equipment; that appellant, knowing these facts, negligently failed to instruct him in regard thereto; that between 10 and 11 o'clock at night, after deceased had been working for more than sixteen consecutive hours in the capacity of brakeman, he was killed through the negligence of the appellant in the following manner: That appellant negligently ordered Minson to make a certain coupling on a switch in the town of Dell, Arkansas; that it was not obviously

dangerous to make the coupling, and Minson proceeded to obey the order. Among other grounds of negligence alleged in the complaint, the appellee charged that appellant was negligent "in the unsafe condition of the unballasted switch track, with a certain trestle work overgrown with weeds, and having a certain tie that was rotten and dangerous for use;" and that it was on account of this condition of the switch track that appellant, while discharging his duty as brakeman, was run over and killed. Appellee asked judgment in the sum of $17,000.

The answer denied the material allegations of the complaint. It alleged that Minson had been employed for several months as fireman and engineer, and was familiar with the roadbed and equipment. Appellant denied specifically that the switch track was in an unsafe condition, that a certain trestle was overgrown with weeds, and that a certain tie on the sidetrack was rotten or dangerous. Appellant did not set up in its answer either of the defenses of assumed risk or contributory negligence.

The facts as stated in the brief of the appellee are substantially correct, and are as follows:

Minson had been a railroad man for a number of years, and had always worked in the capacity of fireman or engineer, almost exclusively the latter. In the spring of 1910, he worked a short while for appellant, first in the capacity of engineer and then as fireman. He laid off in the summer. On the 13th of September, 1910, he was reengaged by the appellant, and on the 14th left Jonesboro as a brakeman upon its freight train . This was the first time he had served as brakeman. The crew of the train at the time it left Jonesboro consisted of the conductor, engineer, fireman and one brakeman, Minson. At Nettleton, the first station out of Jonesboro, the crew picked up a second brakeman, by the name of Flowers. This was also the first time that Flowers had served as brakeman, or had ever worked upon a running train. The train arrived at Dell between 9 and 10:30 that night. The train at that time consisted of thirteen cars. Dell is the junction point of the two lines of the appellant railroad, and at Dell there is a switch about four hundred yards in length which curves around the depot. It became necessary at Dell to detach several cars from the freight train and place them on the switch track, and also

to take several cars from the switch track and attach them to the train.   The conductor gave orders to make the necessary couplings to do this, and he himself walked to the west end of the switch.   The engineer was on the south side of the cab, and the fireman on the north side.   The engine, with eight or ten cars, went east on the main track until the last car of the train was beyond the east end of the switch track.   At this time the other brakeman was on top of the train several cars from the rear end.   Minson then gave the signal for the train to back up on the switch track to make the first coupling, at that time being on the north side of the track.   The train backed slowly, and made the first coupling.   The evidence tends to show that the first coupling was made east of the station.   The station is located between the main track and the switch track, near the east switch.   It is impossible for one on the switch track on the east side of the station to see one on the switch track on the west side of the station, and *vice versa.* The first cars on the switch track were close up to the station. The west end of the cars was on the west side of the station. The conductor saw Minson on the west side of the station and on the north side of the track signalling.   He left the north side, and went out of the conductor's sight.

The other brakeman testified that he could see Minson make the first coupling, and that after he had made it he walked to the end of the cars that had just been coupled on, evidently for the purpose of seeing that all was right before giving the signal to back up.   At that time he was one or two car lengths from the cars to which the second coupling was to be made, showing that he was on the west side of the station.

The testimony tended to show that, after Minson had signalled from the north side, he crossed over to the south side, evidently because his signals from the north side were not seen by the men on the engine because the station obstructed their view.   After Minson had crossed from the north to the south side and had given the signal to the engineer to back, he went out of sight of both the brakeman and the engineer, either down the track or crossed again to the north side.

The car on the end of the train was equipped with an automatic coupler, known as the Tower coupler.   The lever as the car came back west on the track was on the north side

of the car.   In order to make the coupling, it was necessary for Minson to pass from the south side of the track to the north side.   But whether Minson crossed directly to the north side of the track and walked along the side of the track to the place where he was injured, or whether he walked down the center of the track to that point, the positive testimony does not disclose.

After making the first coupling, and after Minson had given the signal to back, the train moved slowly back at the rate of a mile and a half an hour.   As the train neared the cars which were to be coupled, Minson was heard to scream. He was found lying several feet away from the track, on the north side thereof, with his head to the northeast.   He was lying right at the end of the trestle work.   His left leg had been run over in two places.   The first wound began at the ankle on the front side of the leg, and ran diagonally upward across the calf, terminating on the back side of the calf several inches below the knee.   The second wound began at the back side of the thigh, and extended across it at right angles.   There were no other injuries on the body.

The trestle work just opposite where Minson was lying consisted of two hickory logs twelve inches in diameter, laid flat on the ground, parallel one to the other and to the rails. Upon these logs cross-ties had been placed, and on these ties the rails had been laid.   There was no ballast on the trestle work, no earth filling, either on the outside or inside of the rails, between the ties and the ground.   The distance from the top of the ties to the ground was about eighteen or twenty inches. The length of the trestle work was about eighteen feet.   The balance of the switch was ballasted and surfaced up, and it afforded good walking both between the rails and outside of the rails up to the trestle work.

The trestle and the switch track at the time of the injury were covered with weeds, which, on the outside of the rails, averaged from knee to waist high, and completely obscured from view the nature of the trestle work construction.   The weeds had remained there all summer.   The trestle had been built five years before, and no work had been done upon it since that time.

The conductor, who had been working for the appellant

in the capacity of brakeman and conductor off and on since 1900, had noticed that that was a bad place at the trestle, but had paid no particular attention as to how the track was until the night that Minson was killed. He had not warned Minson of it because, according to his evidence, Minson knew more about it than he did. The trestle work was over a low place, and the water came in between the main and switch tracks, and the trestle was built obviously for the purpose of keeping the track out of the water. On the east end of this trestle work the ties were all rotten. Witnesses testified that the spaces between the ties were unfilled both on the outside and inside of the rails. The first tie on the east end was rotten, and blood on the rail began at that tie. The first blood on any of the ties was on this tie, and there was also a little piece of bone found on this tie. The uppermost corner of the north end of this first tie on the east side had been broken off diagonally downward from the end of the tie back nearly to the rail. This break, when discovered by the witness early the next morning, indicated that it was a fresh one. The north end of the piece of tie that was broken off was imbedded in the earth, and the south end stuck up. Minson was lying just opposite this tie. The ground, when first examined by the witness on the morning after the injury, was damp and soft. There were no foot prints whatever on the inside of the track, and no weeds in there had been trampled or crushed down.

Several days before he went on this trip Minson had halfsoled his own shoes, using nails. There were on the front of the tie scratches that looked as though they might have been made by the tacks or nails in the heels of a man's shoes. Witness testified that Minson, while he was lying on the ground, just after his injury, said that he hung his foot and fell, and that it was nobody's fault but his own.

Upon cross examination one of these witnesses testified that Minson, when asked how he got hurt, said: "I stepped through a trestle," and, when asked where, he said: "Over there," pointing to the trestle. When asked whose fault it was, he said: "It was nobody's fault but my own."

There was testimony on behalf of the appellant tending to show that the automatic coupler on the car that ran over Minson was in good condition, but there was testimony on

behalf of the appellee from which the jury might have found that the automatic coupler was not in good condition. One witness testified that he was requested by the station agent of appellant at Nettleton to examine a car that he pointed out, and that he examined the coupler as the agent requested; that the conductor who was on the train at the time of Minson's injury came up after witness had made the examination. He examined the coupling of a Missouri Pacific car at the request of the agent. The conductor took the names of the parties who were present at the time the examination was made, and witness was afterwards subpoenaed as a witness, he presumed by the railroad company. He examined the coupling at one end. "The pin over the coupling was raised by the lever from the outside of the car, but the knuckle of the coupling would have to be opened by hand; the knuckle would not fly open when you pulled the lever up."

The conductor testified that the lever on the Tower coupler would not raise if it was not in working order; that there was a little boot there that threw the knuckle out, and that when the lever was raised the knuckle would fly out.

Several witnesses testified, over the objection of the appellant, that it was not the custom of railroads in this part of the country to build culverts or trestles of the sort described in the evidence upon switch tracks at stations. A sample of the questions asked the witness is as follows:

"Q. Are you familiar with the track construction in this part of the county? A. Yes, sir. Q. State whether or not it is the custom of railroads on their switch tracks to build them by laying two logs lengthwise parallel to the rails and putting the ties across them and the rails on top of them, without any earth filling. A. No, sir." Counsel for the appellant objected to this testimony, stating, "He can not prove negligence by a statement of that kind." The objection was overruled, and the appellant saved his exceptions. At the conclusion of the testimony appellant moved to have the testimony of all the witnesses as to the custom of other railroads throughout the country excluded, for the reason, among others, that the testimony was incompetent because the witnesses were not expert, and because the appellee did not lay sufficient foundation for asking the questions or having them answered. The

court overruled the motion, to which the appellant excepted, and duly preserved its exceptions in the motion for a new trial.

A verdict was rendered in favor of the appellee for the sum of $5,500; judgment was entered for that sum, and appellant has duly prosecuted its appeal.

*E. F. Brown*, for appellant.

*J. R. Turney*, for appellees.

WOOD, J., (after stating the facts). 1. The appellant requested the court to direct the jury to return a verdict in its favor, which the court refused. The appellant duly excepted to the ruling of the court, and urges here that the court erred in not granting its prayer, contending that the undisputed evidence shows that there was no negligence on the part of the appellant which was the proximate cause of the injury to Minson, and also that the undisputed evidence shows that Minson's own negligence was the cause of his injury; and also that the undisputed evidence shows that Minson assumed the risk.

It could serve no useful purpose to discuss in detail the evidence upon which appellant bases its contention. We have set forth somewhat at length in the statement the facts which the testimony tends to prove, and our conclusion is that the questions both of negligence and contributory negligence, under the evidence, were for the jury; also the question as to whether or not Minson had assumed the risk. These questions were all submitted to the jury upon instructions to which no objections have been urged here, and, while the defenses of assumed risk and contributory negligence were not set up in the answer, they were, without objection on the part of the appellee, developed in the progress of the trial, and were treated by the court in its instructions as issues in the cause. It is therefore proper to consider them here, which we have done.

2. In our opinion, the only testimony which would warrant a finding of negligence on the part of the appellant is that tending to prove that appellant had failed to keep its trestle in a safe condition. That testimony which tended to show that appellant had permitted its ties to become rotten so that the same would give way and cause a brakeman, while passing over or stepping upon it in the discharge of his duty, to fall

and thus to receive the injury for which damages are sought, is the only testimony upon which the liability of appellant could be predicated.

The manner in which appellant constructed this trestle originally had nothing whatever to do with the injury to Minson. The manner of construction was in no sense the proximate cause of the injury to the brakeman. The negligence, if any, consisted, not in an improper construction of the trestle in the first place, but in the manner in which it was maintained, and in the unsafe condition in which the evidence tended to show appellant had negligently permitted it to become by failing to keep it in proper repair.

If appellant was liable at all, it was because, through its negligence, it had failed to replace the rotten ties with sound ones before it became necessary for Minson to pass over the same in the work of coupling the cars. Therefore, the testimony as to the custom of other roads in the manner of building such trestles as the one under consideration was wholly irrelevant and incompetent. It introduced an issue of negligence that was foreign to any allegation of negligence that was made in the appellee's complaint. The testimony was highly prejudicial, because it was calculated to cause the jury to conclude that if appellant had not constructed its trestle in the first place in the customary manner of other railroad companies it was negligent and should be held liable for that reason, whereas it is not shown that the original construction of the trestle was in any manner the cause of the injury to Minson.

In this view of the case it is wholly unnecessary for us to determine whether or not the testimony would be admissible in any event, and we pretermit that question.

For the error indicated the judgment is reversed, and the cause is remanded for a new trial.